**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **ADONIS WHITBY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **Civil Action No.** |
| | : | **5:08-cv-242 (HL)** |
| **v.** | : | |
| | : | |
| **JANET NAPOLITANO, Secretary of U.S.** | : | |
| **Department of Homeland Security,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

# ORDER

Before the Court is Plaintiff Adonis Whitby's ("Whitby") motion to amend the complaint (Doc. 77), motion to compel (Doc. 78), and motion for default judgment (Doc. 80). Also before the Court is a motion for summary judgment (Doc. 85) filed by the Defendant Janet Napolitano ("the Government"). For the following reasons, Whitby's motions (Docs. 77, 78, and 80) are denied and the Government's motion (Doc. 85) is granted.

# I. PROCEDURAL AND FACTUAL BACKGROUND[1]

Whitby was hired by the Transportation Security Agency ("TSA") on August 8, 2002, to work as a Supervisory Transportation Security Officer. (Gov't Ex. 4, p. 2). His job responsibilities were to supervise the screening officers and to intervene in situations where a screening officer found a hazardous material or device on an

_____

[1] The facts are viewed in the light most favorable to the nonmoving party, Whitby.

airline passenger.  (Whitby Jan. 26, 2010 Dep. at 30).

Whitby is a black male.  Beginning in 2003, a black supervisor named Bahli Mullins ("Mullins") began to refer to Whitby as Frederick Douglas (Gov't Ex. 7, p. 76-79).  Also in 2003, Whitby wrote letters to Federal Security Director Willie Williams complaining of discrimination.  (Whitby Ex. 1).

Another supervisor, Raymond Dotson ("Dotson"), told Whitby once in late 2004 that "if I want to criticize you, I'll tell you to get some Grecian Formula and do something with your hair." (Id. at 83).  Whitby was offended because he thought the comment was about him needing to look younger.  (Id.).  Whitby found it also to be a racially offensive comment because he was the only black person in the room when Dotson made the comment. (Id. at 85).  Whitby wrote the Office of Civil Rights complaining about Dotson's and Mullins' comments.  He does not recall that he complained about any other comments.  (Id. at 86).  In 2005, Whitby wrote letters to United States Senator Saxby Chambliss complaining of discrimination occurring at TSA. (Whitby Ex. 8).

As a screener supervisor, Whitby had authority to approve requests for leave filed by screeners.  In November 2004, Whitby approved leave for two screeners during a black-out period.  (Gov't Ex. 1, p. 179; Gov't Ex. 2). During a black-out period, supervisors could not allow screeners to take leave unless the screener presented documentation that the leave was needed because of an emergency. (Gov't Ex. 3).  Whitby did not receive the required certification from the screeners

prior to approving their leave during the black-out period so he was issued a letter of reprimand. (Id.). Supervisor Larry Lee ("Lee") issued the letter of reprimand. (Gov't Ex. 7, p. 93). Whitby claims Lee discriminated against him because a white supervisor told Whitby that he did not receive a letter of reprimand from Lee for granting leave to a screener during a black-out period. (Id. at 95).

Whitby attended a mandatory training session on Wednesday, September 7, 2005, his scheduled day off. He requested eight hours of overtime pay on his time sheet for the time he spent at work that day for training. Supervisor Joseph Zavodny instructed Lee to remove the eight hours from Whitby's time sheet because supervisors were not entitled to overtime pay for the mandatory training. Lee also said that Whitby should have made arrangements to take another day off. (Gov't Ex. 5). Whitby claims that his time sheet was altered because of a discriminatory or retaliatory reason.

Whitby next complains that in October 2005 one of his managers changed the hours of his work shift from 12:15 p.m.-8:00 p.m. to 2:00 p.m.-10:00 p.m. (Gov't Ex. 7, p. 110). When Whitby threatened to alert the Office of Civil Rights about the shift change, the shift change was cancelled. (Id. at 113). Changes are sometimes made to schedules in order to ensure a proper ratio of supervisors to screeners (Gov't Ex. 6, p. 154). Whitby believes, however, that because he was the only supervisor to have his schedule changed at that time, then the proposed change must have been because of a discriminatory or retaliatory reason. (Gov't Ex. 7, p.

114, 116).

On November 1, 2005, Whitby received a letter of guidance from Dotson for deleting e-mails without fully reading them. (Gov't Ex. 7, p. 118). Whitby stated he read all his e-mails, but that he read the e-mails without fully opening them. (Id. at 122). Whitby admitted that if he did not open the e-mail fully, the sender would not receive a message stating that he had read the e-mail. (Gov't Ex. 4, p. 119). He also stated that Dotson knew that Whitby had previously complained to the Office of Civil Rights at the time Dotson issued the letter of guidance. (Gov't Ex. 7, p. 119-20). Whitby was told by another supervisor that Andy Fox, a white male, did not read his e-mails, but Whitby did not know whether Dotson knew that Andy Fox did not read his e-mails. (Id. at 125).

On November 29, 2005, Whitby requested to work overtime on his regularly scheduled day off. The request was granted by Lee, but later rescinded by Dotson. (Gov't Ex. 4, p. 119). Dotson explained to Whitby that overtime pay was not possible, but that Whitby could reschedule his day off. (Id.). According to Whitby, TSA cancelled overtime pay for supervisory transportation security officers, but that sometimes overtime pay could occur where there was operational need for it. (Id. at 120). Whitby believes that another white worker, Andy Fox, would have been paid overtime if he wanted to work that day. (Id.). Whitby also remembers that a black woman worked overtime on a Saturday where there was no need for someone to work overtime. (Id.).

4

About ten months later, on September 28, 2006, Whitby went to work on his day off to bid on a new shift. (Id. at 134.) Whitby was not paid for the time he spent at work bidding on the shift. (Id.) None of the workers were paid overtime for coming in to work on a day off. (Gov't Ex. 11, p. 66). Whitby asserts that he was not paid for the time spent at work because of a discriminatory or retaliatory reason.

Whitby attended a work-related class in Savannah, Georgia on October 24, 2006. He submitted a request for reimbursement, but his receipt of a reimbursement check was delayed. It took several months before he was reimbursed. (Gov't Ex. 7, p. 139-40). In the past he received reimbursement for work expenses within a few weeks of submitting the request, but this time it took months to receive compensation and he never was told why there was a long delay. (Id. at 142). He claims the reason for delay was because of his prior complaints of discrimination, but he does not know who was responsible for the delay. (Id. at 143). He agreed, however, that it was possible that the delay in providing him reimbursement could have been caused by an administrative problem. (Id. at 141.).

Also in the fall of 2006, Whitby applied to an open position at TSA titled Bomb Appraisal Officer. Whitby interviewed for the position on October 16, 2006. (Gov't Ex. 11, p. 70). Three individuals interviewed Whitby. He was not selected for the position, which Whitby believes was because he previously complained of discrimination. One of the people who interviewed Whitby averred that Whitby was not offered the position because he did not pass the exam given at the interview.

5

Whitby received a failing score of three, and not a passing score of four, in each of the seven different areas tested. (Gov't Ex. 12, ¶ 12). The other applicant who interviewed for the position was black. He received passing scores in the areas assessed. He was offered the position, but declined the offer. (Id. at ¶ 13). Whitby received a letter informing him that he failed the interview and would not be considered for the position. (Gov't Ex. 11, ¶ 21). Whitby accuses Willie Williams and Dana Hunt ("Hunt"), a member of the panel who interviewed him, of retaliating against him for his earlier discrimination complaints. (Gov't Ex. 7, p. 144). Whitby assumed that Hunt knew about Whitby's prior complaints of discrimination. (Id.).

On March 13, 2007, Whitby received another letter for not reading his e-mail in a timely manner. (Gov't Ex. 9, p. 37-38). The letter was not a formal disciplinary action and was not placed in Whitby's personnel file. (Gov't Ex. 15). Whitby admitted that sometimes his e-mail mailbox was full, which would prevent an e-mail from reaching Whitby. (Gov't Ex. 9, p. 45-46). Whitby claims that the letter was issued to him because of a discriminatory or retaliatory reason.

Then on March 29, 2007, Whitby was relieved of his supervisory duties. As a result, his work station and duty time changed. Beverly Harvard ("Harvard"),a black woman and the Deputy Federal Security Director, averred that she removed Whitby's supervisory responsibilities while an investigation could be conducted into what appeared to be issues about how Whitby was carrying out his supervisory duties. (Gov't Ex. 19, p. 85-86). She averred that there were concerns about how

Whitby was conducting his duties under the "performance personnel evaluation system" ("PASS"). (Id.). Whitby was required to rate his screeners according to the PASS instructions. (Gov't Ex. 9, p. 90). Whitby had to do about 15 to 18 ratings. Whitby disagreed with PASS because he thought it was a disciplinary tool rather than a performance evaluation tool. (Id. at 94). He asserted that he followed the PASS instructions to the best of his ability. (Id. at 96).

Whitby gave each of his screeners a rating of "role model of excellence." This was the highest rating a screener could receive and was to be reserved for only a few and the most outstanding screeners. (Id. at 99). Whitby testified that Supervisors Mann and McClendon instructed him to provide more documentation to support a screener's rating of "role model of excellence." (Id. at 116). Whitby did not feel additional documentation was necessary. (Id.). Supervisors Mann and McClendon said that Whitby needed to change the status of the screeners to a lower rating because there was no way that everyone on Whitby's team could be ranked as role models. (Id. at 118). Whitby did not make the changes. (Id. at 123).

Whitby also testified that Supervisors Mann and McClendon instructed Whitby to provide a reprimand to one of Whitby's screeners for failure to attend work. (Id. at 130-31). On March 29, 2007, Whitby told Supervisor Mann that a verbal warning was sufficient. (Id. at 132,143). Whitby was told by Supervisor Mann that he had until the following Monday to provide a more stringent form of discipline. (Id. at 132, 133). Whitby, in response, told Supervisor Mann that he would not provide more

discipline and instead, Supervisor Mann could terminate Whitby. (Id. at 132).

On October 5, 2007, Hunt, the Acting Deputy Federal Security Director, sent Whitby a notice of proposed removal. (Gov't Ex. 17). The notice informed Whitby that the TSA was proposing to remove Whitby from his position as a security officer. The reasons for the proposed removal were Whitby's failure to change the ratings of his screeners from "role model of excellence" after being instructed to do so by his supervisors, Whitby's failure to read e-mails in a timely manner, and his refusal to address the attendance of a screener under Whitby's supervision. (Id.).

On December 14, 2007, Whitby's employment as a security officer at the TSA was terminated. The reasons TSA gave for the termination were the same reasons stated in the proposed notice of removal. (Gov't Ex. 18).

Whitby first complained of discrimination on October 31, 2005, when he contacted an Equal Opportunity Office counselor (Gov't Ex. 20).[2] On April 2, 2007, Whitby contacted an EEO counselor again regarding another claim of discrimination. (Gov't Ex. 21, p. 5). The two complaints were consolidated by an administrative judge. (Id. at 6). A hearing on the complaints was held before the administrative judge on May 15, 2008. The claims before the administrate judge were that Whitby

---

[2] Whitby contacted the EEO on January 12, 2005, but later withdrew the claim. (Whitby Ex. 8).

Alleged that he was subjected to a hostile work environment on the bases of race (African-American), age (DOB: 1/22/49), and reprisal (prior EEO activity) when:

(1)    In April 2005, Complainant was issued a Letter of Reprimand for allowing two of his subordinates to take leave without providing medical certificates.

(2)    On November 1, 2005, Complainant received a Letter of Guidance for failure to read his emails.

(3)    On or about September 12, 2006, Complainant was directed to cease writing letters to a U.S. Senator and the local Federal Security Director.

(4)    On October 26, 2006, Complainant learned that he was not selected for a position as a Bomb Appraisal Officer.

(5)    On March 11, 2007, Complainant was issued a Letter of Counseling for failure to read his emails.

(6)    On or about March 27, 2007, Complainant was directed to change the performance ratings for his subordinates, and he was directed to discipline a subordinate.

(7)    Complainant was prohibited from exercising supervisory duties.

(Gov't Ex. 21, 23).

That same day, the administrative judge issued a ruling in favor of the TSA on all claims. The Department of Homeland Security issued a final agency decision ("FAD") on June 20, 2008, adopting all of the administrative judge's decisions. (Gov't Ex. 22). The Department of Homeland Security issued a revised FAD on August 1, 2008, because the first FAD contained an error. The first FAD erroneously determined that the administrative judge issued a decision on Whitby's wrongful termination claim, whereas the wrongful termination claim was actually still under investigation and not ripe for adjudication. (Gov't Ex. 23).

On July 22, 2008, Whitby, proceeding *pro se*, filed a complaint in this Court alleging that during his employment at TSA he was discriminated against on multiple

occasions on the basis of his race, color, age, disability, and prior EEO activity. He claimed violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Age Discrimination in Employment Act ("ADEA"), and the Whistleblowers Protection Act ("WPA"). The Court dismissed his ADA and Rehabilitation Act claims (Doc. 50).

The alleged discriminatory acts described by Whitby in his complaint and amended complaints occurred when:

(1)    In 2004, a manager and supervisor referred to Whitby with racial and age insults;

(2)    On April 12, 2005, Whitby received a reprimand for authorizing sick leave during a black-out period;

(3)    During the week of September 7, 2005, Whitby was denied overtime pay for working an eight-hour shift;

(4)    In October 2005, Whitby's work schedule was changed from 1215-2045 to 1400-2200;

(5)    On November 1, 2005, Whitby received a written counseling statement for deleting e-mails sent by his screening manager;

(6)    On November 29, 2005, Whitby's screening manager denied his request for overtime;

(7)    During the week of September 28, 2006, Whitby did not receive overtime pay;

(8)    On October 24, 2006, Whitby did not receive reimbursement for a work-related class he attended;

(9)    On October 31, 2006, Whitby learned he was not selected for the position of Bomb Appraisal Officer;

(10)  On March 13, 2007, Whitby received a letter of counseling for not reading his e-mails in a timely manner;

(11)  On March 27, 2007, Whitby was relieved of supervisory duties;

(12)  Whitby was hospitalized in September 2007 and suffered disability discrimination retaliation; and

(13)  Whitby was terminated from the TSA on December 14, 2007.

Accordingly, the Court will determine whether there are genuine issues of fact

as to each of these instances of alleged discrimination. First, however, it must address other motions filed by Whitby.

## II. WHITBY'S MOTIONS

### A. Motion to Amend the Complaint (Doc. 77)

The Court granted Whitby leave to file an amended complaint to include wrongful termination and WPA claims (Doc. 67). Whitby's current motion to amend the complaint (Doc. 77) repeats his request to add wrongful termination and WPA claims. Whitby does not seem to understand that leave to amend has been granted and that he does not need the Court's permission to file an amended complaint.

In its response to the current motion to amend, the Government assumes that Whitby's motion is intended to be an amended complaint. The Court will also make that assumption. Whitby's current motion to amend his complaint (Doc. 77) is therefore denied as moot. The current motion to amend is considered an amended complaint.

### B. Motion to Compel (Doc. 78)

Whitby moves the Court to compel the production of time and attendance records for the years 2002-2004. Whitby has not explained why the time and attendance records for 2002-2004 could lead to relevant information. Since he has not met his burden of showing that the time and attendance records are discoverable, the motion to compel (Doc. 78) must be denied.

### C.     Motion for Default Judgment and Sanctions (Doc. 80)

Whitby alleges that the Government's failure to provide documents located on compact discs and one computer shows bad faith and warrants sanctions.  The Court disagrees.

The Government, in its response to the Court's show cause order (Doc. 76) explained that certain CDs were unreadable and that the TSA help desk could not extract any information from them.  An information technology specialist determined that the information on the computer's hard drive was not readable and permanently lost.  The Government asserts that it would be an undue burden to obtain the documents located on the CDs and hard drive.

The Court agrees.  The Government has shown that individuals trained in computer technology determined that the information located on the CDs and hard drive was irretrievably lost.  To require additional work to attempt to retrieve the documents would constitute an undue burden.  Further, there is no indication that any kind of spoliation sanction should be imposed on the Government for its failure to back up the documents on the CDs and hard drive.  Failure to preserve evidence rises to the level of sanctionable spoliation "only when the absence of that evidence is predicated on bad faith," such as where a party purposely loses or destroys relevant evidence. Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir.1997).  Here, Whitby has not shown that the Government acted in bad faith.

The motion for default judgment and sanctions (Doc. 80) is denied.  The Court

proceeds to address the Government's motion for summary judgment.

## III.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000). The court may not, however, make credibility determinations or weigh the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence. Id. If the evidence that the nonmovant presents, however, is "not significantly probative" or "merely colorable," then summary judgment may be granted. Liberty Lobby, 477 U.S. at 249.

## IV.    DISCUSSION ON SUMMARY JUDGMENT MOTION

### A.    Failure to State a Claim

Congress passed the Aviation and Transportation Security Act, 39 U.S.C. § 44935 ("ATSA") after the terrorist attacks on September 11, 2001. The act created

a workforce of federal employees to screen passengers and cargo at airports.

Castro v. Sec. of Homeland Sec., 472 F.3d 1334, 1336 (11th Cir. 2006). Section

111(d) of the ATSA, codified as a note to 49 U.S.C. § 44935 states that:

> Notwithstanding any other provision of law, the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions . . . . .

49 U.S.C. § 44935 note.

The Eleventh Circuit Court of Appeals has previously read the phrase

"notwithstanding any other provision law" to mean that Congress intended the

statute to "to take precedence over any preexisting or subsequently-enacted

legislation [on the same subject]." Castro, 1472 F.3d at 1337 (citations omitted).

According to the Eleventh Circuit, the plain language of the ASTA meant that the

TSA need not take the requirements of the Rehabilitation Act into account when

formulating hiring standards for screeners. Id.

The United States Court of Appeals for the Federal Circuit has found that §

111(d) preempts general federal employment statutes. Conyers v. Merit Sys. Prot.

Bd., 388 F.3d 1380 (Fed. Cir. 2004). In Conyers, the Court affirmed the Merit

Systems Protection Board's dismissal of various claims brought by a plaintiff who

was not hired to work as a TSA screener. Conyers, 388 F.3d at 1382. The claims

included a WPA claim. Id.

It is undisputed that Whitby served as a Supervisory Transportation Security Officer at the TSA. His responsibilities included supervising screeners and intervening when a screener found a hazardous material or device on an airline passenger. Whitby's discrimination claims challenge the TSA's ability to "employ" individuals to carry out the agency's screening functions as well as the TSA's ability to "discipline, terminate, and fix the compensation, terms, and conditions of employment." His WPA, Title VII, and ADEA claims therefore are inconsistent with the TSA's authority to regulate its employees who carry out screening duties for the agency. Whitby cannot state a claim against the TSA based on a violation Title VII, the WPA, or the ADEA. His case must be dismissed for failure to state claim.

Alternatively, Whitby's claims can be dismissed on summary judgment for other reasons than failure to state a claim. The Court will explain those alternative bases for granting summary judgment.

### B.    Untimely Claims

Before bringing a Title VII claim in federal court, a plaintiff must exhaust his administrative remedies. 29 U.S.C. § 794(a); Brown v. Gen. Srvs. Admin., 425 U.S. 820, 832, 96 S. Ct. 1961, 1967, 48 L.Ed.2d 402  (1976). A federal employee must consult an EEO counselor within 45 days of the alleged discriminatory act.  29 C.F.R. § 1614.105(a)(1).

The record shows that Whitby initiated his first contact with the EEO on October 31, 2005.  He complains of discriminatory acts occurring more than 45 days

before October 31, 2005. He claims discrimination occurring on April 12, 2005 and September 7, 2005. These alleged discriminatory acts cannot be considered by the Court because they are time barred.

### C.    WPA Claim

Whitby alleges that the Government violated the WPA by retaliating against him for filing discrimination complaints with the EEO. The Government argues that Whitby's WPA claim must be dismissed because of his failure to exhaust administrative remedies.

A federal employee must exhaust his administrative remedies by first filing the claim with the Office of Special Counsel. 5 U.S.C. § 1214(a)(1)(A). Alternatively, if the plaintiff asserts a violation of the WPA in combination with an employment discrimination claim, he can exhaust his administrative remedies by filing a complaint stating both causes of action with the agency's EEO office. 5 U.S.C. § 7702.

The evidence before the Court shows that Whitby did not file a WPA claim with the Office of Special Counsel. The evidence also shows that Whitby's EEO complaints do not contain WPA claims. Further, the Court cannot infer that a WPA claim was raised in his EEO complaints. The WPA protects whistle blowing activities related to reprisal based on disclosure of information and not reprisal based on exercising a right to complain. Spruill v. Merit Sys. Prot. Bd., 978 F.2d 679, 690 (Fed. Cir. 1992). Whitby's EEO complaints allege that he was discriminated against because of his prior EEO activity, not because he disclosed damaging information

about the TSA.

Accordingly, Whitby's WPA claim must be dismissed because he failed to exhaust his administrative remedies.

**D.    Retaliation and Discrimination Claims**

Whitby argues that on numerous occasion the Government retaliated against him for engaging in protected EEO activity and for complaining to his senator and the director of the TSA.    The Court reads his complaint to also allege that for each instance of claimed retaliation the Government also discriminated against him on the basis of age and race.

There is no direct evidence of retaliation or discrimination in this case.  The McDonnell Douglas framework applies to plaintiffs like Whitby seeking to establish retaliation and race and age discrimination based on circumstantial evidence. Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir.2006) (explaining racial discrimination claims based on circumstantial evidence evaluated under McDonnell Douglas framework);   Smith v. J. Smith Lanier & Co., 352 F.3d 1342, 1344 (11th Cir. 2003) (stating that in an ADEA case, the burden-shifting scheme applies);   Goldsmith v. City of Atmore, 996 F.2d 1155, 1162-63 (11th Cir.1993) (explaining that for retaliation cases McDonnell Douglas framework applies).

To establish a prima facie case of retaliation, "the plaintiff must show (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relation between the two

events." Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir.1994) (citations omitted). "To establish a prima facie case for disparate treatment in a race discrimination case, the plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside his protected class more favorably than he was treated; and (4) he was qualified to do the job." Burke-Flower, 447 F.3d at 1323.[3]   To establish a prima facie case of age discrimination, a plaintiff must demonstrate that (1) he was in a protected age group and adversely affected by an employment decision; (2) that the Plaintiff was qualified for his current position or to assume another position if he was discharged; and (3) there is evidence that a fact finder could rely upon to reasonably conclude that the employer intended to discriminate against the Plaintiff on the basis of age in reach the employment decision. Smith, 352 F.3d at 1344.

If a prima facie case of retaliation, race, or age discrimination is established, then the burden shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse employment action. Burke-Flower, 447 F.3d at 1323 (race); Brown v. City of Opelika, 211 Fed. App'x 862, 864 (11th Cir. 2006) (retaliation); Smith, 352 F.3d at 1344 (age).   Then the plaintiff must show that the proferred reason is a pretext for the employer's retaliatory action. Id.   A plaintiff can show

_____

[3] Whitby makes a disparate treatment claim and not a pattern and practice discrimination claim.

pretext "by showing that the employer's preferred explanation is false or unworthy of credence." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

The Court will assume for purposes of summary judgment that Whitby has created a genuine issue of fact as to whether there is a prima facie case of retaliation and racial and age discrimination. It proceeds to determine whether for each alleged act of alleged retaliation and discrimination the Government has provided a legitimate nondiscriminatory reason for the action and whether Whitby has shown that the reason is a pretext for discrimination or retaliation.

The first claim brought by Whitby that is not time barred is his claim for the attempted change in his schedule in October 2005. The claim must be dismissed because Whitby has failed to show that the Government's reason for proposing the schedule change was pretextual. The Government explained that the attempted change in the schedule was made because of a need to balance out the number of supervisors and screeners working at a given time. When Whitby objected to the change and threatened to contact the EEO, his managers decided not to implement the schedule change. The fact that Whitby threatened to contact the EEO does not show that his managers decided to change his schedule because of Whitby's prior complaints of discrimination. Whitby has provided no reason that the Government's explanation for the proposed schedule change was pretextual.

Whitby's claim about receiving a letter of guidance for deleting e-mails must

also be dismissed for failure to create a genuine issue of fact for trial. The Government has presented evidence that it issued the letter of guidance because it received notice that Whitby was not opening his e-mails. Whitby admitted that he was not opening his e-mails. Whitby has not shown that the Government's reason was pretextual. Whitby has not shown, for example, that Dotson did not issue letters of guidance to other employees who he knew were not opening their e-mails. Accordingly, this claim must be dismissed.

Whitby's claim for being denied the opportunity to work overtime on November 29, 2005, must be dismissed because the Government has presented evidence of a legitimate nondiscriminatory reason for denying overtime pay, which is that supervisors were asked take a different day off if they wished to work on the day they were scheduled to be off unless there was an operational need for overtime work. Whitby has stated that he believes another manager was allowed to work overtime when there was no operational need for overtime work, but his belief is not probative evidence of pretext since he provides no other facts to support his belief that the TSA had no operational need that day for overtime work.

Whitby's September 28, 2006, claim must be dismissed because Whitby has failed to show the Government's reason for denying him overtime was pretextual. Whitby admits that none of the workers were paid for the time they spent at work bidding on jobs during a day off. Whitby's conclusory allegations of discrimination are not probative evidence of pretext.

Whitby's claim that the delay in reimbursing him funds for his trip to Savannah must be dismissed because Whitby has failed to present any evidence that the delay was caused by anything other than administrative problems. Accordingly, the claim is dismissed.

Whitby's claims arising out of his non-selection for a bomb appraisal officer must be dismissed because Whitby has not shown that any of the interviewers on the panel knew of Whitby's prior complaints of discrimination and he has not shown that his failing score on the interview assessment was a pretextual reason for not offering him the job.

Further, Whitby's claim for receiving a second letter of counseling for failure to read e-mails must be dismissed because Whitby admits that he sometimes did not receive e-mails because his mailbox was full. Whitby has not provided any evidence that the letter was written for any reason other than because of Whitby's failure to manage his e-mail account properly.

Whitby's claims arising out of Harvard's decision to remove Whitby's supervisory responsibilities must be dismissed for failure to show pretext. The Government presented evidence that Whitby's supervisory responsibilities were removed because he failed to change his PASS ratings for his screeners even though his managers instructed him to make changes to the ratings and because he failed to discipline a screener for attendance after Whitby's managers told him to discipline the screener. Whitby has presented no evidence, aside from his

conclusory assertions, that the decision to remove his supervisory duties was motivated by a retaliatory or discriminatory reason. Accordingly, summary judgment is granted to the Government on this claim.

Finally, Whitby's termination has not been shown to be a pretext for discrimination or retaliation. The Government's legitimate nondiscriminatory reasons for terminating Whitby were that he failed to change the PASS ratings for his screeners, failed to address the attendance issues of one of his screeners, and failed to read his e-mails in a timely manner. Whitby has presented no probative evidence showing these reasons were pretextual. Accordingly, summary judgment is granted to the Government on Whitby's termination claims.

### E.    Hostile Work Environment Claims

The Government reads Whitby's complaint as including hostile work environment claims based on race and age.

Under Title VII, a hostile work environment  exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citation omitted). There is five part test a plaintiff must satisfy to establish a hostile work environment claim: (1) he belongs to a protected group; (2) he has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment was

sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory, abusive working environment; and (5) the employer was responsible for such environment under either a theory of vicarious or direct liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir.2002).

There is sufficient evidence to find a genuine issue of fact as to whether Whitby was subject to harassment based on his race and gender. Whitby testified that he was called Frederick Douglas on multiple occasions and told to get Grecian formula to fix his hair. There is insufficient evidence, however, to create a genuine issue of fact that the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment.

Harassment may serious and pervasive enough if it amounts to an alteration in the terms and conditions of the employee's employment. Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1244 (11th Cir. 2004). A court must also find that a plaintiff's perceived perception that the harassment was serious and pervasive was objectively reasonable. The following factors should be considered when determining if the harassment was objectively severe and pervasive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id.

There is no evidence before the Court that Whitby was subjected to such severe harassment that it altered his conditions of employment. While Whitby

considered the Frederick Douglas and Grecian formula statements offensive, when viewed objectively, the statements cannot be considered severe, threatening, or humiliating.  The statements were sporadic, not physically threatening, did not include especially derogatory language, and could not be reasonably seen to interfere greatly with a person's work performance.

Accordingly, summary judgment must be granted to the Government on Whitby's hostile work environment claims.

## V.    CONCLUSION

For the explained reasons, the Government's motion for summary judgment (Doc. 85) is granted and all other motions (Docs. 77, 78, and 80) are denied.

**SO ORDERED**, this the 23rd day of February, 2011.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

lmc